## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| **Jane Doe 1, Jane Doe 2, Jane Doe 3, and Natalie Schilling,** | § § § | |
| *Plaintiffs,* | § § | **CIVIL CAUSE NO.**_____ |
| **v.** | § § | **JURY DEMANDED** |
| **Metropolitan School District of Washington Township Schools; Board of Metropolitan School District of Washington Township Schools; Evans Branigan III in his individual and official capacity; Rick Granlund in his individual and official capacity; Michael Raunick in his individual and official capacity; and Nathan Shewell in his individual and official capacity,** | § § § § § § § § § § § § | |
| *Defendants.* | § | |

---

### PLAINTIFFS' ORIGINAL COMPLAINT & JURY DEMAND

Plaintiffs Jane Doe 1, Jane Doe 2, Jane Doe 3, and Natalie Schilling ("Natalie") file this Original Complaint and Jury Demand complaining of Defendants Metropolitan School District of Washington Township Schools; Board of Metropolitan School District of Washington Township Schools; Evans Branigan III, Rick Granlund, Michael Raunick, and Nathan Shewell. In support thereof, Plaintiffs would show the Court as follows:

## I.
## PARTIES

1.      Plaintiff, Jane Doe 1 is a female who, at the time of the sexual harassment complained of herein, was a minor student attending North Central High School in Washington Township Schools, Indianapolis Indiana.

2.     Plaintiff, Jane Doe 2 is a female who, at the time of the sexual harassment complained of herein, was a minor student attending North Central High School in Washington Township Schools, Indianapolis Indiana.

3.     Plaintiff, Jane Doe 3 is a female who, at the time of the sexual harassment complained of herein, was a minor student attending North Central High School in Washington Township Schools, Indianapolis Indiana.

4.     Plaintiff, Natalie Schilling, is a female who, at the time of the sexual harassment complained of herein, was a minor student attending North Central High School in Washington Township Schools, Indianapolis Indiana.

5.     Defendant, Metropolitan School District of Washington Township Schools, is a public educational institution with its campus located in Indianapolis, Indiana.  The Metropolitan School District of Washington Township Schools manages and controls various public schools, including North Central High School, operating within the State of Indiana, County of Marion, City of Indianapolis.

6.     Defendant, the Board of Metropolitan School District of Washington Township Schools, is the governing body for a public educational institution with its campus located in Indianapolis, Indiana. The Board of Metropolitan School District of Washington Township Schools manages and controls various public schools, including North Central High School, operating within the State of Indiana, County of Marion, City of Indianapolis.

7.     At all times relevant, Evan Branigan III was the principal of North Central High School.

8.     At all times relevant, Rick Granlund was the performing arts chair at North Central High School.

9.     At all times relevant, Michael Raunick was the choir director at North Central High School.

10.     At all times relevant, Nathan Shewell was the director of theater at North Central High School.

## II.
## JURISDICTION AND VENUE

11.     The Court has subject-matter jurisdiction over this case pursuant to 28 U.S.C. § 1331, which gives district courts original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

12.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), since Defendants reside or resided in this district and the events or omissions giving rise to the claim occurred in this district.

13.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1343, which gives district courts original jurisdiction over (a) any civil action authorized by law to be brought by any person to redress the deprivation, under color of any State Law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; and (b) any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of the civil rights.

14.     Plaintiffs bring this action to redress a hostile educational environment pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), as more fully set forth herein. This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, the Equal Protection Clause, and the Fourteenth Amendment to the United States Constitution.

## III.
## TITLE IX AND THE FOURTEENTH AMENDMENT
## PROTECT STUDENTS LIKE PLAINTIFFS

15.     Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 168l(a), states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be

denied the benefit of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

16.     Implemented through the Code of Federal Regulations (*See* 34 C.F.R. § 106.1), Title IX provides: "A recipient must adopt and publish grievance procedures that provide for the prompt and equitable resolution of student and employee complaints alleging any action that would be prohibited by this part." 34 C.F.R. § 106.8(b).

17.     In *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1988), the United States Supreme Court recognized that a recipient of federal educational funds intentionally violates Title IX, and is subject to a private damages action, where the recipient is "deliberately indifferent" to known acts of discrimination.

18.     In *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), the United States Supreme Court extended the private damages action recognized in *Gebser* to cases where the harasser is a student, rather than a teacher. *Davis* held that a complainant may prevail in a private Title IX damages action against a school district in cases of student-on-student harassment where the funding recipient is: (a) "deliberately indifferent to sexual harassment of which the recipient has actual knowledge" and (b) "the harassment is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Davis*, 526 U.S. at 1669–76.

19.     Title IX jurisprudence as well as Department of Education regulations have long recognized that a single event of sexual assault constitutes harassment so severe, pervasive, and objectively offensive that it deprives its victims of access to the educational opportunities provided by the school.  That is because "[t]he more severe the conduct, the less need there is to show a repetitive series of incidents to prove a hostile environment, particularly if the harassment is physical. Indeed, a single or isolated incident of sexual harassment may create a hostile environment if the incident is sufficiently severe. For instance, a single instance of rape is sufficiently severe to create a hostile

environment." U.S. DEPT. OF EDUC. OFFICE OF CIVIL RIGHTS, *"Dear Colleague" Letter* (April 4, 2011). However, the unwelcome conduct need not rise to the level of rape; even "verbal or physical conduct of a sexual nature" may constitute sexual harassment. *See Stroehmann Bakeries, Inc. v. Local 776, Int'l Broth. of Teamsters*, 969 F.2d 1436, 1441 (3d Cir. 1992).

20.     In 2009, "the Supreme Court held that Title IX does not displace § 1983 claims against school officials because it was not intended to be the exclusive remedy for addressing gender discrimination in schools." *Trentadue v. Redmon*, 619 F.3d 648, 652 (7th Cir. 2010) (citing *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257–58 (2009)). Violating a student's right to be free from school employees' sexual touching and verbal abuse gives rise to a Section 1983 claim for violating the Fourteenth Amendment right to freedom from violations of bodily integrity and personal security. *See, e.g.*, *Wilson v. Cook Cnty.*, 742 F.3d 775 (7th Cir. 2014). Further, a state actor's sexual harassment and disparate treatment of a person based on sex can constitute a violation of the Equal Protection Clause. *See, e.g.*, *Hayden ex rel. A.H. v. Greensburg Cmty. Sch. Corp.*, 743 F.3d 569, 579 (7th Cir. 2014).

21.     Ultimately, as illustrated below, the circumstances giving rise to the claims of these Plaintiffs, and others, demonstrate a history of sexual harassment, discrimination, and abuse perpetrated against female students resulting from the Defendants' deliberate indifference in allowing it to continue for many years.

## IV.
## BACKGROUND FACTS

**A.     Shewell was the key figure in North Central's theater program.**

22.     North Central High School ("North Central") is an educational institution that, at all relevant times, received federal funding for its academic programs and activities and was subject to the requirements of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a).

23.     Established in 1956, North Central Theatre is one of North Central High School's oldest and longest running programs.

24.     Nathan Shewell was the Director of Theater Arts at North Central beginning in the 2013–2014 school year until he was terminated on May 26, 2020 as a result of some of the misconduct alleged as the basis of this lawsuit.

25.     The Plaintiffs were all students in Shewell's theater program at North Central High School.  Jane Doe 1 was a student at North Central from August 2016 until December 2019. Jane Doe 2 was a student at North Central from August 2015 until May 2019.  Natalie Schilling was a student at North Central from 2016 until May 2020.  Jane Doe 3 was a student at North Central from 2016 until May 2020.

26.     Plaintiffs—like others in North Central's highly regarded repertory theater program— entered the program hoping Shewell would help them build a solid foundation for performing in theater into their young adulthood and beyond; instead, they left North Central broken.  Shewell preyed on these young women, grooming them from age fourteen to become sexual partners. This manipulative process eroded their self-esteem, leaving Plaintiffs to face years of work recovering from the psychological trauma Shewell inflicted on them.

**B.     A key feature of how Shewell ran his theater programs involved grooming his female students for sexual abuse.**

27.     "Grooming" is a tactic often used in sexual abuse of children. "Grooming refers to deliberate actions taken by a defendant to expose a child to sexual material; the ultimate goal of grooming is the formation of an emotional connection with the child and a reduction of the child's inhibitions in order to prepare the child for sexual activity." *United States v. Chambers*, 642 F.3d 588, 593 (7th Cir. 2011). Through the "grooming" process, "pedophiles condition their victims to succumb to their sexual advances and be reluctant to report the abuse." *Bush v. Shafter*, 35 F. App'x 234, 236 (7th Cir. 2002).

28.     The American Bar Association explains that sex offenders often groom a child by "building trust with a child and the adults around a child in an effort to gain access to and time alone with her/him."[1] Grooming a child enables the perpetrator:

- "to manipulate the perceptions of other adults around the child[;]

- to manipulate the child into becoming a co-operating participant which reduces the likelihood of a disclosure and increases the likelihood that the child will repeatedly return to the offender[;]

- to reduce the likelihood of the child being believed if they do disclose[;] [and]

- to reduce the likelihood of the abuse being detected."[2]

29.     While a predator may threaten violence, "[m]ore common . . . are subtle approaches" in which "[t]he offender may assume a caring role, befriend the child or even exploit their position of trust and authority to groom the child and/or the child's family."[3] To do so, they may "seek out a child who is less supervised by adults in her/his life. This increases the likelihood that the offender's time with the child is welcomed and encouraged."[4] "Common sexual grooming behaviors are often subtle and may not appear inappropriate" and include when:

- An adult seems overly interested in a child.

- An adult frequently initiates or creates opportunities to be alone with a child (or multiple children).

- An adult becomes fixated on a child.

- An adult gives special privileges to a child (e.g., rides to and from practices, etc.).

---

[1]   AMERICAN BAR ASSN., *Understanding Sexual Grooming in Child Abuse Cases*, *available at* https://www.americanbar.org/groups/public_interest/child_law/resources/child_law_practiceonli ne/child_law_practice/vol-34/november-2015/understanding-sexual-grooming-in-child-abuse- cases/ (Nov. 1, 2015) (last visited Apr. 15, 2021) (citing U.S. Department of Justice, Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking (SMART))

[2] *Id.* (citing CANADIAN CENTRE FOR CHILD PROTECTION INC., *Child Sexual Abuse: It is Your Business*, 2014).

[3] *Id.*

[4] *Id.*

- An adult befriends a family and shows more interest in building a relationship with the child than with the adults.

- An adult displays favoritism towards one child within a family.

- An adult finds opportunities to buy a child gifts.

- An adult caters to the interests of the child, so a child or the parent may initiate contact with the offender.

- An adult displays age and gender preferences.[5]

30.     Shewell employed nearly every one of these tactics on Plaintiffs and other minor female students at North Central.

**C.     Throughout Shewell's tenure at North Central, he put students through a routine called the "impossible problem" that was particularly horrific for female students.**

31.     Shewell required students to participate in what he called the Meisner Acting Technique, claiming it was adapted from the teachings of Sanford Meisner and attempting to reassure students he had done this every year with other students. Shewell would have students recall their worst trauma, write it down on a piece of paper, and give it to Shewell. Then he would take each student into a windowless closet with him alone. While in the closet, Shewell would reenact that trauma with the student, to immerse them in a traumatic state. Then, as the students are in the midst of reliving the traumatic episode, Shewell would give them an "impossible task" (like folding a piece of paper seven) times and have the students attempt to perform it while experiencing the trauma in front of their classmates.

32.     In 2014, the mother of a student reported to Rick Granlund, the Performing Arts Chair at North Central, about the traumatizing experience Shewell was subjecting students to in the impossible problem. This parent notified Granlund that in Shewell's theater class, her son was extremely anxious about the "impossible problem" in which "students are being taken behind closed

---

[5] *Id.*

doors and emerging in tears" because that was "disturbing to" him. The parent challenged Granlund to tell her "under what circumstances it's appropriate for an adult to take a minor behind closed doors and interact with that child in such a way that causes him or her to emerge distraught." Neither Granlund nor any North Central official ever investigated Shewell's use of the "impossible problem" or any of his other improper and abusive treatment of his students.

33.     Moreover, it was female students who suffered most. After noticing that female students were involved in the experience for longer periods, students began timing other students' impossible problems and time in the closet alone with Shewell. On average, the boys were with Shewell in the closet for a couple of minutes. Yet, Shewell kept girls in the closet for five to ten minutes.

34.     In her sophomore year, Jane Doe 1 went into the closet with Shewell for seven minutes. Jane Doe 1 had experienced a sexual assault in middle school. Once in the closet, Shewell pretended to be her rapist. He turned off the light in the closet and put his hand at the bottom of her breastbone at the top of her stomach area, just under her breasts. Then Shewell threatened her, saying "if you don't take your clothes off I'm going to kill you." Jane Doe 1 went into a panic attack. Then, she emerged amid the attack in front of her fellow classmates visibly emotionally and physically upset.

35.     Jane Doe 3's impossible problem in Jane Doe 3's junior year of high school also simulated a past sexual assault. Shewell took her into the closet with lights off and, in order to act as her rapist, asked her to tell him where the rapist touched her. Shewell then put his hands on her hips and when she expressed discomfort, he massaged her shoulders, claiming it was to help her get her memories out. She came out on the verge of crying and, when she emerged, broke down in front of her peers and the nurse sent her home for mental health reasons. Jane Doe 3, now a theater major in college, has since discussed this exercise with her university theater professors, who explained that there is nothing legitimate about the Meisner-inspired exercise as Shewell employed it.

36.     Shewell's "impossible problem" effectively enabled him to perpetrate simulated rape upon students like Jane Does 1 and 3. Had North Central taken action in 2014 (when school officials were told about the "impossible problem" and Shewell being alone with students in a closet) to restrain Shewell from putting his students though the violative exercise, Plaintiffs would never have been made the victims of Shewell's simulated sexual assault, unwelcome physical contact, harassment, and abuse arising from the experience.

**D.     Throughout his time at North Central, Shewell groomed Plaintiffs and other minor female students through further unwelcome physical touching, verbal abuse, and inappropriate sexual situations.**

37.     Plaintiffs all recall Shewell asking them intimate questions about their sex lives and discussing with them his own sex life with his wife. Jane Doe 1 recalls Shewell even instructing her to begin taking birth control.

38.     Shewell regularly made lewd comments about the bodies of his minor female students. For instance, if a girl wore a little tank top he would comment, "oh the girls are out today," referring to the child's breasts. Once when another student accidentally bumped Jane Doe 1's breasts with his elbow, Shewell remarked: "[H]ow could you miss them?" Shewell also talked about how large Jane Doe 1's breasts were and Shewell asked girls whether they were wearing underwear and what color their underwear or bras were. Shewell talked about girls' rear ends and did so in front of other students. Shewell would even walk in on female students changing, seeing them in various states of undress. Shewell would come to where they were dressing, say "knock knock," and—rather than wait for an answer—immediately open the door.

39.     At other times, Shewell compared the bodies of female students to one another, called them names, and belittled them as part of a process of chipping away at their self-confidence and alienating the girls from each other. Shewell would declare that Natalie had a straight figure – not shapely like Jane Doe 1. Shewell also compared Natalie's body with that of another girl, pitting them

against one another and, ultimately, giving the other girl the lead role in most of the productions she auditioned for, while assigning Natalie Schilling roles that always died in the second scene.

40.     In class, Shewell regularly called Natalie and other female students ugly and untalented and would tell Natalie her hair looked ugly or that her outfit was ugly. In Natalie's junior year during show choir practice, Shewell saw her in the hallway and called her a "bitch."

41.     Another teacher, Michael Berg-Raunick, witnessed the interaction, and did nothing. Students also heard Shewell regularly call Jane Doe 1 "rep slut." Further, Shewell called Jane Doe 3 a "whore bitch" and "bitchy." Shewell did not do this with male students in the group.

42.     Shewell continually put the girls in inappropriate sexual positions on stage and with each other. Almost every play he chose had sexual overtones, particularly related to the role of the female students. Jane Doe 3 notes that in her college theater classes, there are comparatively far fewer romantic or sexual themes than Shewell had them perform as early as age 14. Many of the plays he chose had prostitutes as characters. Jane Doe 1 alone played the role of a prostitute four times. As a fourteen-year-old freshman during the 2015 academic school year, Jane Doe 1 was in a one-act play where she was required to act out a sex scene with a senior boy. Shewell had her moan on stage—wearing no under garments—in front of the entire school. When Jane Doe 1 was a sophomore rehearsing for a scene in *Rent* with another girl, Shewell instructed the girls to touch each other's breasts, insisting they hold it for a minute, leering at them as they complied. This was done alone in a room with only Shewell and the girls. Jane Doe 1 had also asked Shewell to block the song for them. The blocking Shewell developed required Jane Doe 1 to straddle the other girl and slide down her legs.

43.     The costuming Shewell required his female students to wear was also inappropriate and uncomfortable to the young girls. Shewell would tell the girls their outfits needed to be tighter. When playing mermaids, Shewell forced four girls—three of whom were freshmen—to wear nothing on top but their bras with shells affixed to the front, disregarding the option to allow them to wear flesh-colored tank tops underneath as other high school theater programs allowed for young female students.

When some girls expressed their discomfort exposing themselves, he dismissed their feelings, telling them "I'm sorry your boobs are so big."

44.     Shewell also regularly and inappropriately touched his minor female students on a weekly, if not daily, basis. Shewell would repeatedly hug Natalie and other female students, often under the guise of acting like "one of the girls" as a way to hug, touch, or squeeze them. In Jane Doe 2's case, Shewell began by touching her shoulders regularly, but eventually he began touching her. Shewell's contact sometimes took a more aggressive turn.  On one occasion, Shewell purposefully slammed into Natalie, knocking her to the floor. When he did, she hit her head on the stage floor in front of her peers. Rather than apologize or try to help her, Shewell laughed in her face. Jane Doe 3 told North Central's Choir Director Michael Raunick about the incident. Mr. Raunick did nothing.

45.     When Jane Doe 3 was forced to do her impossible problem, Shewell put his hands on her hips and massaged her shoulders, which made her highly uncomfortable. During the impossible problem in the closet, Shewell also put his hands just under Jane Doe 1's breasts. In another instance, Jane Doe 1 said Shewell put his hand on her thigh and kissed her forehead and cheek in his private office just after screaming at her. This physical affection toward Jane Doe 1 when she was a minor further contributed to her deteriorating mental health.

**E.     Shewell manipulated and tormented his minor female students by using their vulnerabilities and traumas against them.**

46.     Shewell made fun of Jane Doe 3's dyslexia, having her read aloud to mock her. During her freshman year, Jane Doe 3 fell during the performance of *Oklahoma*. Jane Doe 4 partially tore a ligament in her ankle due to this fall. Again, rather than offer her aid, Shewell told her she was clumsy and should have fallen somewhere else. Shewell also knew Jane Doe 3 was bisexual, and told her she had to be straight to make it as an actor. Then, before her senior year, Jane Doe 3's dad died. That autumn, Shewell told her she should just kill herself and to jump off a bridge. Coupled with her mental state from losing her father, Shewell's abuse made her feel like suicide was her only option. Jane Doe 3 reported Shewell's abuse to Shawn Mcllquham, the technical director for the theater

program employed by North Central. Mr. Mcllquham told her he requested a meeting with Principal Brannigan; but Jane Doe 3 never heard anything about her complaint from the Principal or any other North Central official.

47.     Even though Natalie underwent months of treatment for anxiety, Shewell intimated to her that she should commit suicide, suggesting she jump headfirst off a high set piece in or about 2019. Shewell's cruelty increased toward girls like Natalie, who were less responsive to Shewell's attention. Natalie did "summer stock" community theater, where she was cast in a lead role, even as Shewell refused to ever cast her as a lead. Shewell came to watch, and after the show said, "you are horrible, such a bad job."

48.     Shewell assigned Jane Doe 1 to play a rape victim multiple times. Given her past sexual assault, of which Shewell was fully aware, she never would have chosen to play such roles. Jane Doe 1 would have full panic attacks in rehearsal due to her past sexual trauma, but Shewell forced her to continue practice for the production, even in her emotionally distraught state.

49.     For a time, Shewell would gain girls' trust, leading female students like Jane Doe 1 to reach out to him for support when struggling with these issues. Jane Doe 1 says the more she would confide in him, the more he made it seem like he was there for her. Shewell also used this opportunity to give her hugs.

50.     By April 2019 of Jane Doe 1's junior year, her parents met with Principal Brannigan and told him about the inappropriate nature of Shewell's relationship with and conduct toward his female students. When faced with this report of Shewell's misconduct, Principal Brannigan did not offer any resources or assurance that North Central would take steps to ensure the safety of its students, particularly female students in the theater program steered by Shewell. On the contrary, Principal Brannigan told Jane Doe 1's parents that the one thing he knew at North Central was to "leave the theater program alone."

51.     By 2018, the summer before her senior year, Jane Doe 1's mental health had deteriorated to such a state that she attempted suicide. Jane Doe 1 and her mother decided to disclose this to Shewell because it caused her to miss a week of school and rehearsals. Meanwhile, Shewell had cast her in the lead role of a play and given her charge over costume design. This was too much for Jane Doe 1, and on closing night, she suffered a severe panic attack. Despite her attempted suicide and prior sexual assault, the day after her panic attack, Shewell brought her into his private office, shut the door, and screamed at her so loudly that other students overheard. He threatened not to write her a college recommendation letter and called her crazy. Then when she began crying, Shewell's state softened, and he said, "I love you and I am keeping you in rep theater because I love you" and put his hand on her thigh. Shewell continued: "I want what is best for you, that is why I punish you." At the end of this tirade, he kissed her face. Jane Doe 1 says the encounter made her a "complete wreck" and it was not until it was over that she realized that what happened was not okay. She immediately reported this to the school counselor, Mr. Mathew, who sent her home. By this time, Jane Doe 1 had already reported Shewell to multiple counselors at North Central numerous times for the emotional distress caused by the constant verbal abuse from Shewell.

52.     Jane Doe 2 was also a victim of rape and had been sexually abused by her neighbor from fifth grade until freshman year. After Jane Doe 2 confided in Shewell, he began sending her private text conversations. These conversations progressed to asking her to post nude photographs of herself on the social media platform, Reddit, and he taught her how to take the photos and provided instructions regarding how and where to post the images. Shewell's verbal abuse, inappropriate sexual comments, and unwanted physical touching led Jane Doe 2 to seek psychiatric treatment. During the 2018 and 2019 academic years, Jane Doe 2 was admitted to an inpatient psychiatric hospital at least twice. When she returned once, Shewell told her he missed her, and the two grew even closer.

53.     During Jane Doe 2's senior year, rumors that she and Shewell were sleeping together made her peers turn on her. This, in turn, brought her and Shewell even closer. Shewell made Jane Doe 2 his student assistant, and gained direct and frequent access to her. Shewell would take Jane Doe 2 into his private office, often with the door closed, and keep her there for hours at a time, unsupervised. Around the time he began meeting with Jane Doe 2 in his private office, Shewell installed a mirror by his office door so he could see when someone was coming into the classroom before they walked in.

54.     Shewell discussed his personal life with Jane Doe 2, including his sex life, and asked Jane Doe 2 about her sexual activity. He would frequently text her to continue these inappropriate discussions.

**F.      Shewell's harassment and manipulative grooming created a hostile learning environment that breached Title IX's guarantee of equal access to educational benefits to Plaintiffs.**

55.     Shewell created a culture where it was clear that female students who accepted  his intimate advances and harassment were chosen for better positions in his theater productions. Girls in Shewell's class were treated better when they did not resist his harassment. When they took steps to avoid it or challenged him in any way, however, they were excluded from good roles, screamed at, told they were talentless, and told they should kill themselves.

56.     When these girls did not object, they were given lead roles and treated as Shewell's favorites, which ostracized them from their peers. Compliant students were given larger roles, even if they did not want them or could not handle them. Girls who became Shewell's "favorites" continued to endure his grooming behavior. Shewell would praise them  one minute but in the next scream at them that they were ugly or talentless. The result was that these girls either worked for his approval or lost out on opportunities in the theater  group.

57.     Shewell's harassment of female students was so severe, pervasive, and  objectively offensive that  it undermined and detracted from Plaintiffs' educational experience.  In so doing,

Shewell effectively denied Plaintiffs equal access to the resources and opportunities available to other students at North Central.

**G.      Numerous North Central officials knew about Shewell's misconduct, which was reported by parents of North Central students as early as 2014.**

58.      Performing Arts Chair Rick Granlund knew by 2014 that Shewell was putting students through the abusive process of the "impossible problem" and that the ordeal was triggering not only for the student involved but also caused severe anxiety for the student's peers watching the process.

59.      Jane Does 1 and Natalie also told North Central counselors in 2018 and 2019 about Shewell verbally abusing and making sexually inappropriate advances toward his female students.

60.      Shawn McIlquham and Michael Raunick both knew that Shewell was verbally abusive to the female students having been repeatedly told about and being witnesses to Mr. Shewell's actions.

61.      Jane Doe 1 brought her issues with Shewell to her 11th and 12th grade English teachers (Mather and Lineweaver, respectively) as well as her economics teacher (Dickerson).

62.      In or about April 2019, parents of Jane Doe 1 raised concerns to North Central's principal regarding Shewell's behavior.

63.      The school knew by the 2018 academic year that Shewell was suspected of sexual impropriety with his female students, as he was suspended for a week or so because of rumors he had been sexually involved with one female student, Jane Doe 2.  Although North Central High School claims it investigated the rumor, they did not send anyone to observe his class nor ask his students about their interactions with Shewell to determine if he engaged in any inappropriate behavior with his students, short of a sexual encounter.

64.      In sum, North Central High School had repeated actual notice of Mr. Shewell's physical and emotional abusive behaviors towards female students but failed at every turn to take any meaningful or corrective action to prevent further harassment, discrimination, and abuse.

**H.      Shewell was known to be a serial harasser, even before North Central hired him.**

65.    Shewell had employed nearly every one of the same grooming tactics he used on Plaintiffs on minor female students at another Indiana high school where he taught before North Central hired him.

66.    As local news reported, several of Shewell's female former students "have come forward with misconduct accusations" that occurred during Shewell's tenure at Silver Creek High School in Sellersburg, Indiana, from 2008 until 2012. These women allege that Shewell—as he did at North Central from 2014 to 2020—verbally abused female students, inappropriately touched female students, and had sexual relations with a former student on school grounds.[6] In fact, Silver

67.    Creek's former assistant theater director Cathy Ryan said she repeatedly reported Shewell's behavior to school leaders.[7] "I am still in contact with students all the time," Ryan said.[8] "To know how much they are suffering and have gone through, it's heartbreaking, and personally for me, as an administrator, I still am pretty angry at the system that allowed this to happen."[9] Indeed, Cathy Ryan resigned from Silver Creek in March 2011 specifically because of "serious concerns" about Shewell's verbal abuse toward students, "exposing under-age students to pornography," discussing inappropriate issues with students, and having a "serious relationship" with one of his then- recently-graduated students, and engaging in such behaviors openly in front of his theater students. Her letter was accompanied by seventeen names of students and parents she encouraged the school to speak with who would attest to Shewell's misconduct.

68.    In letters aimed at extending the State of Indiana's limitations period for criminal charges for sexual offenses, former Silver Creek students Ashley Nation and Olivia Castetter recounted their experiences being groomed by Shewell—experiences virtually identical to those

---

[6] Valerie Chinn, *Former Silver Creek High School teacher accused of misconduct gets teaching license pulled*, WDRB.COM (Mar. 3, 2021), https://www.wdrb.com/news/former-silver-creek- high-school-teacher-accused-of-misconduct-gets-teaching-license-pulled/article_b4aecf0c-7c57- 11eb-a729-d709576eece4.html (last visited Apr. 17, 2021).
[77] *Id.*
[8] *Id.*
[9] *Id.*

Plaintiffs went through. Ashley Nation was a senior at Silver Creek in 2008 when she began confiding in Shewell about some difficult situations in her life. That is when Shewell began grooming her:

> "He began with simple touches on my shoulder. They felt like comfort for things that felt out of my control. Small kind gestures to go along with his guidance in life and in theater. Innocent, reassuring. Then one day, he wasn't just touching my shoulder, but also my face; before I knew it, his hands, his focus, had shifted down to feel the small of my back and then his hands would fall around my waist, holding my hips when he was speaking to me.
>
> Suddenly he was commenting on my body, an observation about how my chest or my butt looked, how looking at those areas made him feel. Soon the offhand remarks were more frequent, more explicit, more sexual. Then he started talking to me about his sex life, describing what he liked to do with his wife as well as his other sexual partners. He spoke to me like he was confiding in me, as a way of expressing that he cared about me, about my well-being-like he was the only one who truly did.
>
> My happiness was replaced with control. I withdrew parts of myself from my friends and gave them to him. When friends came too close that were not approved by him, they became victims of him. Verbally abused, mocked, made fun of. He would tell me my friends were wrong, and if those friends were males, he said they only wanted one thing from me.
>
> A little over a year after I met Nathan Shewell, a year of mental, physical, and sexual control, I realized I was being used for his sexual gratification. For a brief moment, I was afraid of losing the one person who convinced he cared above all others. Deep down I knew I had to distance myself from him, and that is what I

did."[10]

69.    Olive Castetter's experience as a student of Shewell's from 2009 to 2012 mirrors Ashley's:

"From the time I joined the theatre program, I heard rumors of his sexual preferences, partners, and history, such as the nude photos found of his wife on his work computer, his relationships with former students, such as [Ashley Nation], and his alleged comments toward senior girls each year, who we dubbed his 'girl of the year.'

Then, as I aged, I heard many more comments personally—comments on our bodies, how attire flattered (or didn't) our breasts and figures, and his latest 'girl of the year.' My already-graduated friends told me how they'd made reports to our principal, or their parents had, yet nothing had been done—Shewell remained our instructor and director, after all. Meanwhile, these same friends—some of whom had engaged in sexual relationships with him after they'd graduated—warned me that Shewell's treatment of me mirrored that of how he'd treated prior 'girls of the year,' and I needed to keep my guard up. At the time, I brushed it off. 'That must just be Shewell,' I'd tell myself, 'If it was really that bad, administration would do something.'

It was at the start of my junior year (August of 2012) that I began to feel exactly how toxic the environment Shewell had established was.

I came from an at-risk home, and Shewell was the most consistent adult in my life. He provided me with food, clothes, and money when I needed it, even paying for a surgery when my mother couldn't. However, a newcomer to the theatre

_____

[10] *Ashley Nation statement about Nathan Shewell* (Feb. 21, 2021), *available at* WDRB.com, https://www.wdrb.com/ashley-nation-statement-about-nathan-shewell/pdf_905520c2-80f1-11eb-9468-9fc07d201ed7.html (last visited Apr. 17, 2021).

department in the winter of 2011 had drawn his attention, and after receiving forwarded text messages detailing their sexual relationship, I went to the principal myself. I stated that it concerned me because of things I'd witnessed Shewell say and do, as well as rumors I'd heard, that he may not have waited until she graduated before having sex with her. I was told by the principal that there was nothing they could do since she no longer was a student, and although Shewell was married, how he decided to treat his marriage was his business, not the school's. I was then sent to class, despite my protests that this revelation made me feel like I had a target on my back, that I was marked for his 'girl of the year' for the class of 2014."[11]

70.     Any review of Shewell's references or a background check would have revealed the numerous instances of Shewell's sexual misconduct with minor girls at another Indiana school prior to applying for work at North Central. This would have put North Central on notice as of 2013 that Shewell posed girls in the theater program at North Central the same risk of inappropriate sexual behavior, abuse, and manipulative grooming he engaged in the same year at Silver Creek.

**I.     North Central did absolutely nothing to prevent Shewell from continuing the psychological abuse and sexual harassment he inflicted on Plaintiffs and other female students for years.**

71.     Despite that Shewell was known in Indiana for abusing, manipulating, and grooming his minor female theater students, North Central allowed Shewell complete autonomy over the theater program. Empowered with the self-governance North Central granted him, Shewell routinely met with minor female students in his office behind a closed door. He was never even admonished not to be alone with students or to leave his door open. In fact, he installed a mirror so he could monitor when someone passing nearby may see that he was alone with students in his office. The only isolated action North

---

[11] Olivia Castetter, *My Response to the Nathan Shewell Allegations* (Feb. 22, 2021), *available at* https://dontaskliv.wordpress.com/2021/02/23/my-response-to-the-nathan-shewell-allegations/ (last visited Apr. 17, 2021).

Central took was performing a cursory investigation of the rumored sexual relationship between Shewell and Jane Doe 2.

72.     Not one North Central school official investigated any of the sexual harassment complaints raised by students or parents, even though students who told counselor[s] about Shewell's abusive treatment and inappropriate behavior had to undergo inpatient psychiatric treatment, talked about committing suicide, and even attempted suicide. Even then, Shewell mocked them for it and used their vulnerability against them.

73.     North Central's admitted refusal to intervene or supervise Shewell and his theater department reflects a complete lack of oversight of Shewell and his perverse conduct with his female theater students. Performing Arts Chair Granlund only observed one of Shewell's classes in the time Plaintiffs were students and, in that isolated instance, Shewell was on his best behavior. North Central officials simply abdicated their responsibilities to ensure their students' safety.

**J.      By leaving Shewell to run his theater program unsupervised, North Central enabled the sexual grooming program that has traumatized Plaintiffs and other North Central students—consequences that Defendants could have readily prevented.**

74.     North Central could have taken any of these actions upon learning of allegations that Shewell was inappropriate with his students:

75.     Monitor Shewell's behavior and theater classes;

76.     Question students about reported experiences with Shewell, including the "impossible problem," rumored sexual relationships with students, inappropriate touching and verbal abuse, and sex-based discrimination;

77.     Supervise or check in on Shewell routinely;

78.     Limit Shewell's unsupervised access to certain areas of the school;

79.     Limit Shewell's access to students, particularly without supervision; and/or

80.     Inform parents and students about precautions they could take to help identify inappropriate conduct and how to report it.

81.     Instead, North Central did absolutely nothing beyond its cursory investigation of the rumored sexual relationship with Jane Doe 2, which did not address any of the concerns raised by parents or students.

**K.     Through his twisted process of manipulation, abusive treatment, and sexual harassment of Plaintiffs, Shewell deprived Plaintiffs of their educational opportunities and caused them extensive emotional trauma.**

82.     In sum, Nathan Shewell employed tactics of manipulation, abuse, inappropriate sexual touching and commentary, and improper teacher-student relationships to groom minor female students under his control to engage in improper sexual relationships with him. Through this process, it became clear to students that only by acquiescing to Shewell's advances could girls enjoy opportunities in Shewell's theater program. In so doing, Shewell deprived these underage girls of educational opportunities and subjected them to sexual harassment and contact—treatment disparate from how Shewell treated boys in his classes.

83.     Tragically, Plaintiffs have endured severe mental anguish and other injuries as a result of Shewell's unfettered abuses—abuses made possible by Defendants' policy of turning a blind eye to Shewell's theater program. Defendants' willful ignorance in the face of Shewell's reported abuses subjects them to liability for Plaintiffs' injuries suffered as students of Shewell.

**V.**
**CAUSES OF ACTION**

**COUNT 1**
**DISCRIMINATION UNDER TITLE IX:**
**SEXUALLY HOSTILE CULTURE AND DELIBERATE INDIFFERENCE**
**(Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a))**

84.     Plaintiffs reallege and incorporate by reference all facts and allegations set forth in the preceding paragraphs.

85.     Shewell's sexually related comments about the minor Plaintiffs' bodies and physical sexual advances toward Plaintiffs were not welcome and constitute sexual harassment under Title IX.

86.     Plaintiffs and other complainants who reported Shewell's sexual misconduct told an "appropriate person" about their sexual harassment. Numerous parents and students informed North Central officials about Shewell's sexual misconduct and abusive, harassing behavior toward students before Plaintiffs informed Principal Brannigan, Performing Arts Chair Granlund, Choir Director Michael Raunick, and North Central school counselors about Shewell's abusive and sexually harassing behavior toward them. Each of these individuals had authority to take corrective action to end the discrimination.

87.     Furthermore, Defendants failed to conduct a thorough background examination of Shewell before hiring him to work as the theater teacher at North Central. Had Defendants conducted the most cursory background investigation, they would have uncovered that Shewell had engaged in grossly inappropriate conduct toward female students at Silver Creek High School in Sellersburg, Indiana, as recently as 2013—the very same year he was hired to teach students at North Central. Female students at Silver Creek alleged Shewell groomed them for sexual encounters with him, employing precisely the same abusive, harassing, sexually inappropriate, and discriminatory tactics Plaintiffs claim he used against them at North Central. Moreover, no disciplinary action was taken toward Shewell at Silver Creek before he began his tenure at North Central. Thus, it was obvious when Defendants hired Shewell that Shewell would engage in same abusive, harassing, sexually inappropriate, and discriminatory conduct with female students at North Central.

88.     Defendants and North Central officials—including but not limited to Principal Brannigan, Choir Director Michael Raunick, and school counselors—actually knew of Shewell's demonstrated penchant for sexual misconduct and the risk he posed to minor female students of North Central before he harassed Plaintiffs. North Central officials, in fact, willfully ignored Shewell's demonstrated history of sexual misconduct at Silver Creek High School, where he psychologically manipulated minor female students and groomed them for sexual encounters with him the same year

North Central hired him. Defendants, thus, willfully ignored the risk Shewell posed to minor female students of North Central before they gave him control over the theater program at North Central.

89.     Defendants were on notice of at least two women who accused Shewell of sexual harassment as recently as 2013—including psychological manipulation and sexual grooming—at Silver Creek and were on notice of Shewell continuing precisely the same harassment of students at North Central by at least 2014.

90.     After conducting a cursory investigation into rumors Shewell was having sexual relations with a student, in which neither Plaintiffs nor other students were asked about Shewell's behavior toward them, Defendants deliberately chose not to take any further action regarding Shewell's continual sexual harassment of minor female students, to investigate the other incidents, or to protect female students of North Central from Shewell's sexual harassment and assault. Such failures were clearly unreasonable.

91.     Defendants' deliberate indifference is evident from their failure to take any meaningful action to address Nathan Shewell's sexual misconduct, relentless abuse, and harassment of minor female students at North Central. First, Plaintiffs and others informed North Central school officials—including Principal Evans Brannigan, Performing Arts Chair Rick Granlund, Choir Director Michael Raunick, and North Central school counselors—about Nathan Shewell's verbal abuse, sexual harassment, and sexually improper behavior toward minor female students of Shewell. All of these North Central officials failed to take corrective action in response to these complaints by students and their parents. Second, any investigation North Central performed into Shewell's work history before hiring him would have revealed that Shewell had precisely the same history of abuse, harassment, and grossly improper sexual conduct toward female students at Silver Creek High School in Sellersburg, Indiana.

92.     Despite notice of Shewell's persistent pattern of violating minor girls under his control and supervision, Defendants did nothing.

93.    In short, each of these North Central officials—employees and agents of Defendants—and Defendants themselves were deliberately indifferent to the risk that Shewell posed his minor female students. The result of these failures was that from at least 2014 until 2020, Shewell continually harassed, abused, and physically violated numerous minor girls who attended North Central High School.

94.    Defendants' deliberate indifference to Shewell's ongoing sexual harassment exposed Plaintiffs to continued sexual harassment—and physical violations—which was so severe, pervasive, and objectively offensive that it effectively barred their access to meaningful educational opportunities and benefits including academics and on-campus events and activities available to male students.

95.    As a direct and proximate result of Defendants' deliberate indifference to the sexually hostile educational environment Shewell created, Plaintiffs suffered damages and injuries for which Defendants are liable.

### COUNT 2
### DISCRIMINATION IN VIOLATION OF THE FOURTEENTH AMENDMENT EQUAL PROTECTION CLAUSE UNDER SECTION 1983 (U.S. CONST., AMEND. XIV; 42 U.S.C. § 1983)

96.    Plaintiffs reallege and incorporate by reference all facts and allegations set forth in the preceding paragraphs.

97.    The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution gives Plaintiffs the right to be free from invidious discrimination in classifications and other governmental activity.

98.    Defendants are a state-sponsored educational institution and had a duty to give male and female students equivalent levels of protection.

99.    Nathan Shewell, also an employee of North Central, was acting under color of law in his role as Director of Theater Arts at North Central.

100.    In his role as Director of Theater Arts, Shewell had a policy of manipulating female students by abusing, harassing, and physically violating them and then rewarding those that did not

resist his improper conduct with better performance opportunities and better treatment, while those that did resist were further mistreated and excluded from those performance opportunities. This grooming behavior was directed exclusively toward female students. In doing so, Shewell created a pervasively hostile environment toward his female students.

101.    Defendants had a custom, policy, or practice of entirely ignoring Shewell's actions, allowing him full control over the theater program, without supervision. Principal Evans Brannigan, Performing Arts Chair Rick Granlund, Choir Director Michael Raunick, and North Central school counselors knew as early as 2014 about Shewell's abusive exploitation of students and his verbal abuse, sexual harassment, and sexually improper behavior toward minor female students since then. In furtherance of their policy of willful ignorance, however, Defendants turned a blind eye toward these allegations and complaints made by students and parents to North Central officials about Shewell's sexual harassment, verbal abuse, and sex-based discrimination of minor female students.

102.    By singling out female students for disparate treatment and by abusing, harassing, and physically violating them at least in part for the purpose of attempting to coerce them into sexual relationships with him, Shewell carried out a policy that discriminated against female students. Defendants' policy of actively ignoring Shewell's actions and decisions in running the theater program and teaching theater classes—even when students and parents alerted North Central officials to the impropriety of Shewell's actions and decisions—was the moving force behind Plaintiffs' sexual harassment and discrimination on the basis of sex.

103.    Accordingly, Defendants breached their duty to give male and female students at North Central equivalent levels of protection.

104.    Furthermore, Defendants failed to conduct a thorough background examination of Shewell before hiring him to work as the theater teacher at North Central. Had Defendants conducted the most cursory background investigation, they would have uncovered that Shewell had engaged in grossly inappropriate conduct toward female students at Silver Creek High School in Sellersburg,

Indiana, as recently as 2013—the very same year he was hired to teach students at North Central. Female students at Silver Creek alleged Shewell groomed them for sexual encounters with him, employing precisely the same abusive, harassing, sexually inappropriate, and discriminatory tactics Plaintiffs claim he used against them at North Central. Moreover, no disciplinary action was taken toward Shewell at Silver Creek before he began his tenure at North Central. Thus, it was obvious when Defendants hired Shewell that Shewell would engage in same abusive, harassing, sexually inappropriate, and discriminatory conduct with female students at North Central.

105.    Defendants were, therefore, deliberately indifferent to the risks Shewell posed female students like Plaintiff at North Central.

106.    As a direct and proximate result of Defendants' custom, policy, or practice of turning a blind eye toward Shewell's sexual harassment toward and discrimination of Plaintiffs on the basis for sex, Plaintiffs suffered damages and injuries for which Defendants are liable.

### COUNT 3
### VIOLATIONS OF THE FOURTEENTH AMENDMENT DUE PROCESS CLAUSE
### UNDER SECTION 1983
### (U.S. CONST., AMEND. XIV; 42 U.S.C. § 1983)

107.    Plaintiffs reallege and incorporate by reference all facts and allegations set forth in the preceding paragraphs.

108.    The Due Process Clause of Fourteenth Amendment to the United States Constitution gives Plaintiffs the right to personal security and bodily integrity.

109.    Defendants are a state-sponsored educational institution and had a duty not to deprive Plaintiffs of their rights to personal security and bodily integrity.

110.    Nathan Shewell, also an employee of North Central, was acting under color of law in his role as Director of Theater Arts at North Central.

111.    In his role as Director of Theater Arts, Shewell had a policy of preying on female students by abusing, harassing, and physically violating them, particularly toward girls who had been sexually assaulted previously. Among other things, after forcing these girls into a dark closet with him,

Shewell touched Jane Doe 1 just below her breasts, touched Jane Doe 3 on her hips, and massaged Jane Does 3's shoulders during the "impossible problem" in which Shewell forced Plaintiffs to reenact simulated prior sexual traumas. He also put his hand on Jane Doe 1's thigh and kissed her forehead and cheek behind the closed door of his private office. Shewell also regularly rubbed Jane Doe 2's shoulders and progressed to touching her rear end. Shewell even purposefully slammed into Natalie—who rebuffed his advances—knocking her to the floor, causing her to hit her head.

112.   As part of his manipulative process, Shewell targeted Plaintiffs in front of their peers, publicly declaring Jane Doe 3 and Natalie should kill themselves, screaming at Plaintiffs, calling Jane Does 1 and Natalie fat, ugly, and talentless, and openly talking about Plaintiffs' breasts, underwear, and rear ends in front of classmates. Shewell's abusive and physically violative process of grooming, thus, violated Plaintiffs' rights to bodily integrity and personal security.

113.   Defendants had a custom, policy, or practice of entirely ignoring Shewell's actions, allowing him full control over the theater program without supervision. Principal Evans Brannigan, Performing Arts Chair Rick Granlund, Choir Director Michael Raunick, and North Central school counselors knew as early as 2014 about Shewell's abusive exploitation of students and his verbal abuse, sexual harassment, and sexually improper behavior toward minor female students since then. In furtherance of their policy of willful ignorance, however, Defendants turned a blind eye toward these allegations and complaints made by students and parents to North Central officials about Shewell's inappropriate touching and verbal abuse of minor female students.

114.   Shewell sexually and inappropriately touched minor female students' bodies and verbally abused them, at least in part for the purpose of coercing them into sexual relationships with him. Defendants' policy of actively ignoring Shewell's actions—even when students and parents alerted North Central officials to the impropriety of Shewell's actions—was the moving force behind the violations of Plaintiffs' bodily integrity and personal security. No rational person could believe that

sexual or inappropriate touching of minors by a state actor is constitutionally permissible under the Due Process Clause.

115.    Accordingly, Defendants breached their duty not to violate Plaintiffs' rights to bodily integrity and personal security.

116.    Furthermore, Defendants failed to conduct a thorough background examination of Shewell before hiring him to work as the theater teacher at North Central. Had Defendants conducted the most cursory background investigation, they would have uncovered that Shewell had a history of sexually touching and verbally assaulting minor female students at Silver Creek High School in Sellersburg, Indiana, as recently as 2013—the very same year he was hired to teach students at North Central. Female students at Silver Creek alleged Shewell groomed them for sexual encounters with him, employing precisely the same abusive, harassing, and sexually inappropriate tactics Plaintiffs claim he used against them at North Central. Moreover, no disciplinary action was taken toward Shewell at Silver Creek before he began his tenure at North Central. Thus, it was obvious when Defendants hired Shewell that Shewell would engage in the same sexual contact with and verbal abuse toward female students at North Central.

117.    Defendants were, therefore, deliberately indifferent to the risks Shewell posed female students like Plaintiff at North Central.

118.    As a direct and proximate result of Defendants' custom, policy, or practice of turning a blind eye toward Shewell's inappropriate physical contact with and verbal abuse toward Plaintiffs, Plaintiffs suffered damages and injuries for which Defendants are liable.

## COUNT 4
### NEGLIGENCE UNDER INDIANA STATE LAW AS TO JANE DOE 1 AND NATALIE SCHILLING

119.    Plaintiffs reallege and incorporate by reference all facts and allegations set forth in the preceding paragraphs.

120.    Defendants owed a duty of reasonable care and supervision to its students, Jane Does.

121.    Jane Doe 1 and Natalie Schilling were students at North Central and students of Mr. Shewell when he groomed them and abused his position of authority over them to facilitate the sexual harassment and assault he then inflicted upon these minor girls.

122.    As stated above, Shewell had a history of sexually touching and verbally assaulting minor female students at Silver Creek High School in Sellersburg, Indiana, as recently as 2013—the very same year he was hired to teach students at North Central. Female students at Silver Creek alleged Shewell groomed them for sexual encounters with him, employing precisely the same abusive, harassing, and sexually inappropriate tactics Plaintiffs claim he used against them at North Central. No disciplinary action was taken toward Shewell at Silver Creek before he began his tenure at North Central. Moreover, his wrongdoing at Silver Creek followed a brief tenure at La Plata High School in La Plata, Maryland, where Mr. Shewell taught for less than seven months before abruptly resigning on June 30, 2007.

123.    Despite this sordid history, however, Defendants neglected to conduct any background examination of Shewell before hiring him to work as the theater teacher at North Central. Had Defendants conducted the most cursory background investigation, they would have uncovered red flags showing Shewell's penchant for sexual contact with and verbal abuse toward female high school students. Thus, had Defendants exercised reasonable care toward Plaintiffs [by performing their due diligence of conducting a background check], it would have been obvious when they hired Shewell that he would engage in the same sexual contact with and verbal abuse toward female students at North Central.

124.    In addition to his prior employment, Washington Township had direct knowledge of Mr. Shewell's behavior while employed at North Central High School. Repeatedly, during the 2018– 2019 academic school year, Plaintiffs and others informed North Central school officials—including Principal Evans Brannigan, Performing Arts Chair Rick Granlund, Choir Director Michael Raunick, and North Central school counselors—about Nathan Shewell's verbal abuse, sexual harassment, and

sexually improper behavior toward minor female students of Shewell. Defendants knew since 2014 that Shewell was forcing theater students to go with him into a closet, where Shewell would intentionally elicit disturbing psychological traumas from the minors—including forcing minor girls to relive past sexual traumas—as part of his "impossible problem." During this "impossible problem," Shewell inappropriately touched Jane Does 1 and 3 and verbally abused them and other students, directing particularly fierce abuse toward minor girls. But despite being notified by a parent, no North Central official ever investigated Shewell's use of the "impossible problem" or any of his other improper and abusive treatment of his students.

125.    All of these North Central officials failed to take corrective action in response to these complaints by students and their parents.

126.    Despite notice of Shewell's persistent pattern of violating minor girls under his control and supervision, Defendants did nothing. The result of this dereliction of duty was that from at least 2014 until 2020, Shewell continually harassed, abused, and physically violated numerous minor girls who attended North Central High School.

127.    In light of their substantial notice of Shewell's misconduct, Defendants should have reasonably foreseen and anticipated Shewell's harassment and assault of Plaintiffs.

128.    Defendants, thus, breached their well-established duty to Plaintiffs when they failed to investigate numerous complaints they had received about Nathan Shewell's sexual misconduct before or during Shewell's harassment and abuse of Plaintiffs. Such evidence of prior similar actions before Defendants hired Shewell—and when they continued to retain him—is evidence that they knew of his propensity to commit similar misconduct later.

129.    Defendants had supervisory authority over Shewell at all relevant times. Defendants had a duty to exercise reasonable care to control Shewell so as to prevent him from intentionally harming others.

130.   Defendants breached this duty by retaining Shewell as a North Central employee and as the Director of Theater Arts even after Defendants knew Shewell was in the habit of engaging in misconduct that was dangerous to minor students, particularly female students, at North Central.

131.   As a result of the Defendants' breach of this duty, Plaintiffs suffered injuries and incurred the damages sought herein.

132.   Furthermore, Shewell's sexual assaults and abuse of Plaintiffs happened while Shewell was acting within the course and scope of his role as their theater teacher and Director of Theater Arts in charge of the highly regarded North Central theater program, whose students often participate in the program in preparation for collegiate education and professional careers in theater.

133.   Because of Defendants' multiple breaches of duty, Plaintiffs were sexually harassed and assaulted by Defendants' employee Nathan Shewell. Defendants' negligence directly caused Jane Does' sexual harassment and assault.

134.   As a direct and proximate result of Shewell's harassment and assault —itself directly caused by Defendants' negligent actions and inaction—Plaintiffs suffered damages and injuries for which Defendants are directly liable.

## VI.
## ATTORNEYS FEES

135.   Because of this action, Plaintiffs have retained Michelle Simpson Tuegel and Jeff Gibson to represent them in their claims against Defendants. Accordingly, Plaintiffs seek attorneys' fees incurred pursuant to Title IX.

## VII.
## JURY DEMAND

136.   Plaintiffs respectfully demand a jury trial in this matter.

## VIII.
## <u>RELIEF REQUESTED</u>

137.    For the foregoing reasons, Plaintiffs respectfully request that the Court enter judgment against Defendants consistent with the relief requested herein, and for any and all other relief to which Plaintiffs may be justly entitled, including actual damages, compensatory damages, court costs, attorneys' fees, and pre- and post-judgment interest.

138.    Wherefore, Plaintiffs respectfully request that this Court will:

a.    Enter judgment against Defendants in such amounts as will fully and adequately compensate Plaintiffs for the damages they have suffered in amount to be determined at trial, which amount is not less than seventy-five thousand dollars. ($75,000.00);

b.    Award Plaintiffs punitive damages against Defendants in an amount to be determined by a jury for Defendants' violations of the law, which amount is not less than seventy-five thousand dollars ($75,000);

c.    Award Plaintiffs pre-judgment and post-judgment interest;

d.    Award Plaintiffs their actual expenses of litigation, including reasonable attorney's fees.

e.    Award Plaintiffs such other and further relief as this Court deems just and proper.

DATED: May 4, 2022

Respectfully submitted,

By:/s/ *Michelle Simpson Tuegel*

    **Michelle Simpson Tuegel**
    **THE SIMPSON TUEGEL LAW FIRM, PLLC**
      *Admitted*
      Bar No. 24075187
      3301 Elm St.
      Dallas, Texas 75226
      Tel: 214-774-9121
      Fax: 214-939-9229
      michelle@stfirm.com

  /s/ *Jeff Gibson*

    **Jeff Gibson**
    **WAGNER REESE, LLP**
      *Admitted*
      Bar No. 22362-49
      11939 N. Meridian Street, Suite 100
      Carmel, IN 46032
      Tel: 317-834-7138
      Fax: 317-569-8088
      jgibson@wagnerreese.com

    **ATTORNEYS FOR PLAINTIFFS**